Argued and submitted November 6, 2014, reversed and remanded
January 7, 2015

In the Matter of H. H. C., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L.
and A. S.,
*Appellants.*
Washington County Circuit Court
J130504
Petition Number 01J130504M

In the Matter of E. E. C. Z., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L.
and A. S.,
*Appellants.*
Washington County Circuit Court
J130505
Petition Number 01J130504M

In the Matter of A. E. S., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

A. L.
and A. S.,
*Appellants.*
Washington County Circuit Court
J130506
Petition Number 01J130504M
A156911

342 P3d 174

Megan L. Jacquot argued the cause and filed the brief for appellant A. L.

Sarah Peterson, Deputy Public Defender, argued the cause for appellant A. S. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

In this consolidated appeal, father and mother challenge the juvenile court's judgments asserting jurisdiction over their three children. Parents assign error to the court's failure to dismiss the dependency petitions regarding the children and to the court's determination that the Department of Human Services (DHS) proved each allegation in the petitions. Because the record did not permit the juvenile court to determine that the "child[ren's] condition or circumstances gave rise to" a current threat of harm to the children, we reverse and remand.

"[W]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.,* 257 Or App 633, 639, 307 P3d 444 (2013). We "assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record." *Id.* We state the facts consistently with that standard.

This case concerns three children: A (10 years), E (1 year), and H (3 months). Mother and father live in the paternal grandparents' home. Up until the time of removal, A and E had lived in that home for their entire lives. Father's family is Chinese and of Mien descent. In their culture, large families live together, honoring close cross-generational ties, and grandparents and older relatives often act as primary caregivers to children.

When mother gave birth to A in 2004, the paternal grandparents immediately assumed primary parenting responsibilities. For the most part, mother and father lived in the home and interacted with A like close relatives rather than parents. At times, mother and father lived elsewhere, but they maintained frequent contact with the paternal grandparents.

In January 2013, mother gave birth to E. Mother and E tested positive for methamphetamine at the time of the birth, and mother admitted to using methamphetamine

six months before her pregnancy and three days before E was born. E was not "drug-affected" and the paternal grandparents became his primary caregiver when he came home from the hospital. DHS made several attempts to contact parents in the first few months of E's life, but after receiving no response, DHS closed the case because DHS had "no concerns about the current situation * * * of [E] and [A] with the paternal grandparents."

In December 2013, mother gave birth to H. Mother denied current substance abuse, but refused drug testing and did not allow H to be drug tested. However, because E had tested positive for methamphetamine 11 months earlier, the hospital tested H's meconium and found it to be positive for methamphetamine, though the lab was unable to pinpoint the time or frequency of use. Two days later, a DHS protective services worker informed parents that DHS intended to place H with the maternal grandfather due to their "lack of cooperation" and the "need to continue and perform a full assessment." In response, according to the DHS caseworker, father "pounded a fist into a palm" and "punched the chair that he was sitting on."

That same day, DHS filed dependency petitions regarding each of the three children, alleging that, under ORS 419B.100(1)(c), "[t]he conditions and circumstances endanger the welfare of said child" based on alleged facts as to both parents. DHS alleged that mother could not safely parent the children because she (1) had substance abuse problems, (2) lacked necessary parenting skills and an understanding of the basic needs of her children, and (3) left the children in the care of unsafe persons. DHS also alleged that father suffered from the same deficits, as well as anger and impulse control problems. At the jurisdictional hearing, the paternal grandparents were identified as the alleged "unsafe caregivers."

At a shelter hearing on December 24, the juvenile court asserted temporary jurisdiction over the children. The court placed H with the maternal grandfather, but allowed A and E to remain in their home with mother, father, and the paternal grandparents. On December 30, at a shelter review hearing, the court ordered a safety plan that required the

paternal grandparents to supervise all of A's and E's interactions with mother and father and required parents to submit to random urinalysis (UA) tests. DHS referred parents for substance abuse assessments; mother completed her assessment, but father did not. Mother participated minimally in the recommended treatment for a few weeks and submitted four UAs that tested negative for controlled substances. Father submitted one UA that tested positive for methamphetamine but submitted another that tested negative for all controlled substances.

In mid-January 2014, the paternal grandparents were indicted on two counts each of criminal conduct (racketeering and conspiracy to commit unlawful manufacture of marijuana); they were charged with providing financial assistance to father's brother's alleged marijuana-growing operation. Authorities also indicted 10 other family members (and five nonrelatives). The paternal grandparents do not otherwise have criminal records.

On January 27, the paternal grandparents met with DHS to discuss "potential * * * violations of the safety plan." They acknowledged that on one occasion during the period of shelter care, the paternal grandfather left the home during a family emergency, leaving A and E unsupervised with parents while the paternal grandmother was sleeping upstairs. The next day, DHS removed A and E from the home and placed them with the maternal grandmother. DHS refused to certify the paternal grandparents as a foster placement for the children because of their pending criminal charges, the violation of the safety plan, and a "founded disposition" against the paternal grandfather for physical abuse that the parties agree occurred 10 years earlier.

The juvenile court held a jurisdictional hearing on the petitions for the three children over the course of four days between February and April 2014. Although parents contested the allegations about their parental deficits, they did not propose to be primary caregivers for the children. Instead, parents presented evidence that they intended to maintain an arrangement where other family members primarily cared for the children. The paternal grandparents intended to continue to act as primary caregivers but had

made arrangements for either of the paternal grandmother's sisters to care for the children in the event that the grandparents were convicted and incarcerated; both women had existing relationships with the children and were not facing criminal charges.

The juvenile court determined that jurisdiction had been proven and that DHS had met its burden "as to each and every allegation in the * * * petitions." The court noted specifically that the paternal grandparents "who the parents look to to provide virtually all the care of these children, are currently under [i]ndictment for [d]rug [t]rafficking" and referred to "evidence with respect to drug trafficking in the home." The court mentioned "concern of the amount of firearms found in the home * * * [and] the current drug charges [that] have created an environment where there's an increased risk of unsafe people in the home." The court also noted the grandparents' violation of the safety plan and that "DHS is unable to certify these grandparents at this time as a placement resource" and referred to the paternal grandfather's founded allegation for physical abuse "that has yet to be addressed." Accordingly, the court found all allegations proven under ORS 419B.100(1)(c).

Mother and father appeal separately and assign multiple errors. Because it is dispositive, we address only the assignment of error to the trial court's assertion of jurisdiction over each child based on the court's determination that there was a current threat of harm reasonably likely to be realized by all the children. We assess whether the record established evidence that "was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied." *N. P.*, 257 Or App at 640.

Parents argue that DHS failed to prove any of the alleged parenting deficits because mother and father did not need to serve as primary caregivers for their children, and instead demonstrated "protective capacity" by arranging for extended family members to serve as primary caregivers. They also both argue that, even if the state could prove the factual allegations in the petition, the state has not proven a nexus between their parental deficits and any harm to the children, as required under the statute, because the evidence

demonstrates that the children are happy, healthy, and on target physically and emotionally. As a result, in parents' view the harm that the state alleges is speculative harm, not a current threat of serious loss or injury. Therefore, parents argue that the juvenile court may not assert jurisdiction.

DHS argues that jurisdiction is proper because the totality of the circumstances demonstrated a reasonable likelihood of harm to the children. DHS argues that this was shown through parents' drug use, lack of responsibility for their children, refusal of DHS services, and parents leaving A and E with the paternal grandparents for long periods of time. DHS contends that these circumstances, taken as a whole, demonstrate a current threat of harm to the children, but argues that the harm primarily follows from parents' "lack of interest in taking care of their children, and their unresolved use of methamphetamine." DHS further argues that the paternal grandparents, parents' choice of primary caregivers, are unsafe; as evidence of that, DHS points to the paternal grandparents' violation of the safety plan, their indictment for drug crimes, and the grandfather's founded disposition for physical abuse. DHS specifically notes evidence that the children are at risk in the grandparents' home because homes associated with drug trafficking have a high likelihood of being robbed.

Under ORS 419B.100(1)(c), a juvenile court may assert jurisdiction in a dependency case when a child's "condition or circumstances are such as to endanger the welfare" of the child. A child is endangered if the child is exposed to conditions or circumstances that "present a current threat of serious loss or injury." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). DHS has the burden to prove that the threat is current and nonspeculative; "it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past." *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012). Rather, "there must be a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011).

The key inquiry in this case is "whether, under the totality of the circumstances, there is a reasonable

likelihood of harm to the welfare" of the children. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks omitted). DHS also has the burden of proving a connection between the allegedly risk-causing conduct and the harm to the children. *C. J. T.*, 258 Or App at 62. In this case, we reverse, because the record is insufficient to demonstrate that the children were endangered and that any risk of harm was current and nonspeculative.

There is clearly sufficient evidence in the record that mother and father abuse drugs and lack basic parenting skills and an understanding of how to provide for their children's basic needs. If they were acting as the children's primary caregivers, DHS might well have proved a connection between the risk-causing conduct and harm to the children. However, in this case, because parents have entrusted the care of their children to the paternal grandparents, the question is whether—even assuming that DHS proved those parental deficits—the evidence in the record, as a whole, established that the totality of the children's circumstances or conditions exposed them to a current risk of serious loss or injury that was reasonably likely to be realized.

DHS identified four pieces of evidence to demonstrate that the paternal grandparents' care of the children created a risk of harm to them: (1) the paternal grandparents' indictment for financial participation in a marijuana grow operation; (2) evidence that drug houses have a higher risk of robbery, which creates harm to the children; (3) the 10-year-old founded disposition of physical abuse by the paternal grandfather; and (4) the paternal grandparents' violation of the safety plan. We address each piece of evidence individually, and then together, to determine whether the totality of the circumstances establish a risk of harm to the children.

First, an indictment for this type of conduct, without more, is not sufficient to show a current and nonspeculative risk of harm to the children. A DHS caseworker opined that, hypothetically, a person's engagement in criminal activity opens up "possible increased risks of other criminals, other unsafe people having contact with your children." However, a search of the paternal grandparents'

home did not reveal any evidence of criminal activity that would create a risk of harm to the children; rather, the only evidence presented was speculative. The detective testified that it "would be implied" that marijuana was transported to the grandparents' home, even though no marijuana was found during the search. The detective also testified that the firearms found during the search were legal and locked securely in a safe. Indeed, the detective was unable to articulate a specific harm to the children that was present in the paternal grandparents' home apart from the speculative harm from potential criminal activity. Moreover, the grandparents had an established backup plan to ensure that the children remained with familiar relative caregivers should the grandparents be convicted and incarcerated.

Second, the evidence about the grandparents' home being at risk for robbery, likewise, was purely speculative. The detective testified that there is potential for "grow locations or stash locations" to be robbed and that such crimes often involve guns, even if not reported to police. However, no evidence of criminal activity was found in the home, and there was no evidence that the home was a grow or stash location. Thus, DHS failed to show a nexus between that circumstance and a risk of harm to the children.

Third, DHS identified the paternal grandfather's 10-year-old founded disposition of physical abuse as evidence of a risk of harm to the children. However, DHS cited confidentiality concerns and refused to present evidence on the nature of the abuse in the founded disposition. In evaluating whether an offender presents a risk of harm to children, we require "some nexus between the nature of the offender's prior offense and a risk to the child at issue." *State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 158, 211 P3d 293 (2009). Here, there is insufficient evidence to demonstrate a nexus between the paternal grandfather's prior physical abuse and a current risk of harm to the children.

Fourth, DHS identified the paternal grandparents' failure to act as appropriate safety plan supervisors as evidence of a current threat of harm to the children. However, one breach of the safety plan does not rise to the level of

"current risk of harm" when the children were not endangered or "threatened with serious loss or injury." *A. F.*, 243 Or App at 386. We also find it significant that the paternal grandparents freely revealed their conduct to DHS and that there is no other evidence that they otherwise failed to supervise the children.

Considered in its totality, the evidence that DHS presented was insufficient to prove a reasonable likelihood of harm to the children, and DHS could not identify any harm caused to A and E in living with the paternal grandparents. Instead, the record demonstrates that they were well-adjusted and happy children before their removal and, indeed, that the greatest harm they suffered was from the removal itself.

In addition, DHS's arguments rest on a mistaken assumption that parents cannot give custody of their children to people who are not DHS-certified. To the contrary, the court must have jurisdiction for DHS to change the placement of children and, for jurisdiction to be warranted, there must a current threat of harm to the children. ORS 419B.100(1)(c). Because parents have entrusted the primary care of the children to the paternal grandparents, who do not pose a current threat of harm, the court did not have a basis for asserting jurisdiction over the children. *See State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 86, 106 P3d 627 (2005) (concluding that, where mother's family did not pose a threat to the child, that mother's inability to parent independently did not amount to a condition seriously detrimental to the child).

Accordingly, we conclude that the juvenile court erred in asserting jurisdiction over A, E, and H because the evidence was legally insufficient to demonstrate that, under the totality of the circumstances, there was a current risk of nonspeculative harm to the children.

Reversed and remanded.